People v Blandford (2021 NY Slip Op 00058)





People v Blandford


2021 NY Slip Op 00058


Decided on January 7, 2021


Appellate Division, Third Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered: January 7, 2021

111005

[*1]The People of the State of New York, Respondent,
v
Reginald E. Blandford, Appellant.

Calendar Date: November 16, 2020

Before: Garry, P.J., Lynch, Clark, Mulvey and Reynolds Fitzgerald, JJ.


Peter D. Salton, Ithaca, for appellant.
Weeden A. Wetmore, District Attorney, Elmira (Susan Rider-Ulacco of counsel), for respondent.



Garry, P.J.
Appeal from a judgment of the County Court of Chemung County (Baker, J.), rendered March 25, 2019, convicting defendant upon his plea of guilty of the crime of attempted criminal possession of marihuana in the second degree.
In November 2017, state troopers conducted a traffic stop of defendant's vehicle, followed by a canine sniff search that disclosed marihuana and paraphernalia associated with drug sales in the vehicle. Defendant was charged with one count of criminal possession of marihuana in the second degree. After County Court denied defendant's motion to suppress the evidence found in the vehicle, defendant pleaded guilty to one count of attempted criminal possession of marihuana in the second degree. In accordance with the plea agreement, the court sentenced defendant, as a second felony offender, to a prison term of 1½ years, to be followed by two years of postrelease supervision, and ordered his enrollment in a shock incarceration program pursuant to Penal Law § 60.04 (7). Defendant appeals.
We reject defendant's contention that County Court should have found that the traffic stop and the canine search were unlawful. The testimony at the suppression hearing established that a State Police investigator in the City of Elmira, Chemung County saw defendant drive past him at about 5:00 p.m. without wearing a seatbelt. Based upon past surveillance and general police knowledge, the investigator knew that defendant was involved in the illegal sale of narcotics. As the investigator followed defendant's vehicle, he contacted a state trooper who was a canine handler, advised the trooper of what he had seen and asked the trooper to come to the scene to conduct a traffic stop of defendant's vehicle. The investigator watched defendant drive into the parking lot of a convenience store that was familiar to the investigator as a "trouble spot" for drug transactions. Defendant got out of his vehicle and entered the store, where he remained for about five minutes. When defendant left the store, he made physical contact with at least one of several people outside the store, which the investigator described as "a handshake, type hug thing." The investigator did not see anything in defendant's hands during this contact, but he testified that, in his professional experience, it was common for participants in outdoor drug transactions to "hug somebody, tap them up, and make an exchange" of currency and narcotics. He described the convenience store as "notorious" for such activity. Defendant and a male passenger then got into defendant's car and drove away.
After being contacted by the investigator, the trooper drove with his canine partner to the convenience store. As he arrived, he saw defendant leaving the building with no purchases in his hands. The trooper watched defendant conversing with people outside the store and "giving hand shakes, high fives, [and] hugs," behaviors that, in the trooper's experience, occurred "routinely" during [*2]drug transactions. The trooper followed defendant's vehicle and, at 5:10 p.m., observed that the license plate was inadequately lit. The trooper turned on his emergency lights to initiate a stop and observed a "slow roll response," in which defendant slowed down but did not immediately stop his vehicle. The trooper saw defendant make "furtive movements" inside the car, ducking down in his seat, moving around, reaching over the passenger seat and doing something that the trooper could not see "in the floorboard area and/or the backseat." He stated that, in his professional experience, this behavior was not typical of most drivers, who usually came to an immediate stop and "s[a]t easy within the seat" when pulled over.
After the vehicle stopped, the trooper spoke with defendant at the driver side window and obtained identification information for defendant and the passenger. The trooper permitted the passenger to leave, asked defendant to step out of the vehicle and spoke with him briefly about such matters as his reason for visiting the store without making a purchase and the movements he had made in the vehicle. In response, defendant "talked in a circle" and gave inconsistent answers. The trooper then asked defendant for permission to search the vehicle. Defendant gave limited consent, agreeing only to a search of the backseat and passenger seat area. The trooper retrieved his canine partner from his vehicle and, at 5:19 p.m., conducted a canine sniff search of the outside of defendant's car. The canine alerted to the outside of the trunk and, when the trunk was opened, to a bag that contained multiple bags of marihuana, digital scales and other paraphernalia associated with drug sales.
First addressing the traffic stop, a police officer who has probable cause to believe that a driver has committed a traffic infraction may stop a vehicle without violating either the Fourth Amendment of the US Constitution or article I, § 12 of the NY Constitution, even if the officer's primary motivation is to conduct another investigation (see People v Robinson, 97 NY2d 341, 346 [2001]). The Vehicle and Traffic Law requires vehicles to have "a white light which shall illuminate the numerals on [the rear license] plate in such manner as to render such numerals legible for at least [50] feet from the rear" (Vehicle and Traffic Law § 375 [2] [a] [4]). This requirement applies in certain circumstances, including the period between 30 minutes after sunset and 30 minutes before sunrise — but also "at such other times as visibility for a distance of [1,000] feet ahead of such motor vehicle is not clear" (Vehicle and Traffic Law § 375 [2] [a]). Thus, contrary to defendant's argument, the fact that 30 minutes had not yet passed after sunset did not render the stop improper.[FN1] The trooper testified that it was fully dark at the time of the stop and that he and defendant had their vehicles' headlights on, as did other vehicles passing on the roadway. When [*3]the trooper turned off his headlights briefly to check the license plate light, he observed that it did not illuminate the plate. Thus, it was "objectively reasonable" for the trooper to conclude that the requisite visibility did not exist and that a traffic violation had been committed (People v Guthrie, 25 NY3d 130, 134 [2015]).[FN2] Additionally, the trooper was entitled to rely upon the investigator's previous observation that defendant was driving without a seatbelt — a separate traffic violation that also provided probable cause for the stop (see Vehicle and Traffic Law § 1229-c [3]; People v Patterson, 173 AD3d 1737, 1738 [2019], affd 34 NY3d 1112 [2019]; People v Robinson, 134 AD3d 1538, 1539 [2015]). Accordingly, County Court did not err in finding that the traffic stop was lawful (see People v Gibbs, 167 AD3d 1580, 1580 [2018], lv denied 33 NY3d 976 [2019]; People v Williams, 132 AD3d 1155, 1155-1156 [2015], lv denied 27 NY3d 1157 [2016]).
Turning to the canine search, the detention of a motorist after a traffic stop "must be reasonably related in scope, including its length, to the circumstances which justified the detention in the first instance, unless circumstances arise which furnish the police with a founded suspicion that criminal activity is afoot" (People v Banks, 148 AD3d 1359, 1360 [2017] [internal quotation marks and citations omitted]). Such a founded suspicion permits the extension of the stop beyond its original purpose and "authorizes a request for consent to search and [a] canine search of the vehicle's exterior" (People v Boler, 106 AD3d 1119, 1122 [2013]; see People v Devone, 15 NY3d 106, 113-114 [2010]; People v Blanche, 183 AD3d 1196, 1199 [2020], lv denied 35 NY3d 1064 [2020]). We agree with County Court that, taken together, the trooper's observations of defendant engaging in behaviors commonly seen in outdoor drug transactions at a location known for such activity, his "slow roll response" and furtive movements after the trooper initiated the stop and his evasive, inconsistent answers to the trooper's questions created a founded suspicion that criminal activity was afoot (see People v Devone, 15 NY3d at 113-114; People v Sanders, 185 AD3d 1280, 1282 [2020], lv denied 35 NY3d 1115 [2020]; People v Hawkins, 45 AD3d 989, 991 [2007], lv denied 9 NY3d 1034 [2008]). Thus, the trooper properly extended the stop beyond its initial justification and conducted the canine search — which, in any event, took place only nine minutes after the initial stop and, according to the trooper, was completed in less than a minute (compare People v Blanche, 183 AD3d at 1199; People v Banks, 148 AD3d at 1361-1362). Finally, the search of the trunk's interior was justified when the canine alerted to the outside of the trunk (see People v Sanders, 185 AD3d at 1282; People v Boler, 106 AD3d at 1122). Accordingly, County Court did not err in denying defendant's suppression motion.
Lynch, Mulvey and Reynolds Fitzgerald, JJ., concur.
Clark, J. (dissenting).
I agree with the majority that the initial traffic stop was valid. However, in my view, the evidence fell short of establishing a founded suspicion that criminality was afoot, so as to justify the canine search. Accordingly, I respectfully dissent.
As the majority notes, testimony at the suppression hearing established that, prior to the traffic stop, a State Police investigator and a state trooper observed defendant at a convenience store that is known to be a "trouble spot" for drug sale activity and that defendant spent a few minutes in the store, but did not walk out with any observable merchandise. The testimony also demonstrated that, after exiting the store, defendant engaged at least one person in a "hand shake, type hug thing." At no point, however, was defendant observed to have exchanged money, drugs or anything else. The evidence established that defendant then got back into his car and that someone from the store got into his front passenger seat. As discussed by the majority, the trooper thereafter initiated a lawful traffic stop of defendant's vehicle. The trooper testified that defendant did not immediately stop in response to his emergency lights and that, upon coming to a stop, defendant engaged in "furtive movements" within the vehicle.
The trooper's testimony regarding his ensuing interaction with defendant was general, vague and, at times, confusing. The trooper testified that he asked defendant various questions, including why he visited the convenience store and that, in response, defendant "talked in a circle." However, the trooper's testimony revealed that defendant had provided an explanation for his presence at the store. Indeed, according to the trooper, defendant indicated that he was giving a ride home to his passenger, who was related to the owner of the convenience store. The trooper's testimony did not reveal why he was dissatisfied with defendant's explanation. Rather, without providing any specificity as to defendant's statements, the trooper stated that defendant's statements were "not consistent" with what he had observed of defendant. The trooper did not identify those inconsistencies, and merely emphasized that he did not observe defendant leave the store with any merchandise. Defendant's seemingly plausible explanation for visiting the store, corroborated by the presence of the passenger, could dispel — at least in part — any suspicion of criminality arising from defendant's presence and interactions at the store. In my opinion, the remaining circumstances, including the "slow roll" stop and the furtive movements, did not give rise to a founded suspicion that criminality was afoot, so as to justify the canine search (compare People v Devone, 15 NY3d 106, 113-114 [2010]; People v Sanders, 185 AD3d 1280, 1282 [2020], lv denied 35 NY3d 1115 [2020]; People v Blanche, 183 AD3d 1196, 1198-1199 [2020], lv denied 35 NY3d 1064 [2020]). As such, I would grant defendant's motion [*4]to suppress the physical evidence.
ORDERED that the judgment is affirmed, and matter remitted to the County Court of Chemung County for further proceedings pursuant to CPL 460.50 (5).



Footnotes

Footnote 1: We find that the time of sunset is a fact that "may be determined by resort to easily accessible sources of indisputable accuracy" (Matter of National Fuel Gas Supply Corp. v Schueckler, 35 NY3d 297, 329 [2020] [internal quotation marks and citations omitted]), and thus take judicial notice of the fact that sunset took place at 4:45 p.m. in Elmira on the day in question, less than 30 minutes before the stop at 5:10 p.m.

Footnote 2: As the stop was objectively reasonable for these reasons, the trooper's testimony about his inaccurate belief regarding the applicability of the 30-minute time period does not affect the stop's lawfulness (see People v Pena, ___ NY3d ___, ___, 2020 NY Slip Op 06836, *2 [2020]).