# State of New York
# Court of Appeals

MEMORANDUM

This memorandum is uncorrected and subject to revision before publication in the New York Reports.

No. 84  SSM 17
The People &c.,
        Respondent,
     v.
Reginald Blandford,
        Appellant.

Submitted by Peter D. Salton, for appellant.
Submitted by William D. Vandelinder, for respondent.

MEMORANDUM:

The order of the Appellate Division should be affirmed.

Defendant Reginald Blandford challenges the denial of his motion to suppress marihuana found during a traffic stop of his vehicle. In the course of a stop predicated on

- 1 -

the observation of traffic violations—the legality of which defendant does not contest before this Court (*see generally People v Robinson*, 97 NY2d 341, 349 [2001])—defendant consented to a search of the backseat of his vehicle. Instead of conducting that search, the police officer walked his canine around the exterior of the vehicle and, in mere seconds, the canine alerted to the trunk. Defendant argues that law enforcement lacked founded suspicion that criminal activity was afoot and, thus, unlawfully conducted the exterior canine sniff search.

A canine sniff search of a vehicle's exterior is lawful if police possess a founded suspicion that criminal activity is afoot (*see People v Devone*, 15 NY3d 106, 110 [2010]). Determinations regarding the existence of a founded suspicion of criminality involve mixed questions of law and fact (*see People v Mercado*, 25 NY3d 936, 937 [2015]; *see also People v Garcia*, 20 NY3d 317, 324 [2012]). Therefore, our review is "limited to whether there is evidence in the record supporting the lower courts' determinations" (*People v McIntosh*, 96 NY2d 521, 524 [2001]; *see also People v Britt*, 34 NY3d 607, 617 [2019]). As pertinent here, "[t]his rule applies where the facts are disputed, where credibility is at issue or *where reasonable minds may differ as to the inference to be drawn*" (*People v Howard*, 22 NY3d 388, 403 [2013] [internal quotation marks and citation omitted]).

Based on the evidence presented at the suppression hearing, including the officers' observations prior to and during the stop, there is record support for the determination that a founded suspicion of criminal activity existed here and, thus, the issue is beyond further review (*Mercado*, 25 NY3d at 937; *People v Martin*, 19 NY3d 914, 916 [2012]; *Devone*,

15 NY3d at 113-114).[1] Defendant's remaining contentions, to which the dissent alludes,

are unpreserved (*see People v Gates*, 31 NY3d 1028, 1029 [2018]).

---

[1] Our reading of the facts differs from that of the dissent, and in any event, the dissent does not apply the proper standard of review.

WILSON, J. (dissenting):

When people meet, they often shake hands. If more familiar, they may clasp hands and bring their bodies momentarily together, tapping each other on the back. Sometimes, people fully embrace, acknowledging their companionship before beginning a conversation or parting ways. Those common greetings are among the most basic and

bedrock forms of human interaction, more profound than words. They are how we greet each other, acknowledging our shared connections as acquaintances, friends, or family.

On an ordinary November afternoon, outside the On the Way convenience store in Elmira, New York, Reginald Blandford greeted someone thusly. Instead of seeing his handshake or hug as greeting, however, two officers interpreted his actions as a drug sale. They already suspected Mr. Blandford might be involved in drug sales, and they knew the On the Way store was in an area where drug sales occurred.

A state trooper followed Mr. Blandford as he drove away. When he noticed that one of Mr. Blandford's two rear license plate lamps was out, the trooper pulled Mr. Blandford over. The trooper then relied on Mr. Blandford's behavior outside the On the Way store, along with other observations before and during the traffic stop, to determine he had the appropriate level of suspicion to detain Mr. Blandford while he brought a drug-detection dog to sniff the exterior of Mr. Blandford's car. That canine sniff led to the discovery of marijuana in the car. Because both the New York and U.S. constitutions protect individuals from such intrusions on their reasonable expectations of privacy under these circumstances, I dissent.

## I.

Mr. Blandford caught the attention of law enforcement before the afternoon of his arrest. Investigator Backer "knew [Mr. Blandford] was involved in the illegal sale of narcotics" from "general police knowledge." On the afternoon of Mr. Blandford's arrest, Investigator Backer attempted to summon a state trooper to stop Mr. Blandford, whom

Investigator Backer believed was driving without wearing his seatbelt. No trooper arrived before Mr. Blandford parked at the On the Way convenience store, which Investigator Backer described as a "trouble spot in the city." The Investigator radioed Trooper Shive, describing Mr. Blandford's car, noting the alleged seat belt infraction, and telling Trooper Shive that he thought "there may be some criminal activity afoot" outside the On the Way store. Trooper Shive understood that to mean actions that might suggest potential "hand-to-hand dealing," but that "could be just as simple as loitering."

By the time Trooper Shive arrived, Mr. Blandford was inside the store. Several other people were outside the store. After a few minutes, Mr. Blandford emerged. As Mr. Blandford walked to his car, Investigator Backer observed him doing "a handshake, type hug thing" before entering the driver's side of his car. Trooper Shive similarly observed "hand shakes, high fives, hugs, whatever," along with the "exchanging of [unheard] verbiage." Though the behavior "in and of itself" did "not necessarily mean[ ] anything," Trooper Shive's suspicion was aroused.

Trooper Shive and Investigator Backer observed someone exit the store and sit in the front passenger seat of Mr. Blandford's car. After Trooper Shive began following Mr. Blandford's car, he noticed that one of its two license plate lamps was out, a violation of Vehicle and Traffic Law § 375 (2) (a) (4) under certain conditions. Trooper Shive activated his emergency lighting. According to Trooper Shive, Mr. Blandford then did a "slow roll response," where his vehicle "didn't immediately come to a stop." While "the slow roll was going on," Trooper Shive saw Mr. Blandford make "furtive movements" inside the

car, "ducking down in his seat, moving about within his seat, and at a point reaching over the passenger's seat, doing something appearing to be down in the floorboard area and/or the backseat," though he could not "see physically where [Mr. Blandford's] final reach [was]."

When Mr. Blandford stopped, Trooper Shive had him exit the car to conduct a roadside interview. Mr. Blandford explained that he was giving the person in his car, Mr. Gerdeep Singh, a ride home and that Mr. Singh's family owned the On the Way store. Mr. Blandford also mentioned his wallet, money and going to the store to make purchases. Despite those innocuous responses, Trooper Shive felt that he and Mr. Blandford "kind of talked in a circle." He recognized that giving Mr. Singh a ride home and going to the On the Way store to buy items were plausible explanations for why Mr. Blandford went to and exited the store. Nevertheless, Trooper Shive found it suspicious that Mr. Blandford said he went to the store to buy something but exited with no visible purchases. Based on the foregoing, Trooper Shive decided he had a "founded suspicion that criminal activity was afoot" and asked Mr. Blandford for consent to search his vehicle. Mr. Blandford gave "mixed consent," granting Trooper Shive permission to search the backseat area, his driver's seat area, and part of the passenger compartment only—the very areas in which Trooper Shive said he saw "furtive movements." After receiving that consent, Trooper Shive looked into the car. The passenger compartment produced nothing of interest; he did see Mr. Blandford's wallet in the rear. Finding no hint of criminality so far, Trooper Shive did not tell Mr. Blandford he was free to go. Instead, he retrieved his drug-detection dog

("Clark," an impressively beautiful and regal animal) and had the dog sniff the exterior of the car. The dog alerted to the trunk, leading the trunk to be opened. Once the trunk was opened, the dog alerted to a bag inside the trunk. Trooper Shive then conducted a warrantless search of the bag, in which he found marijuana. He released Mr. Singh and detained Mr. Blandford.

Mr. Blandford was charged with one count of criminal possession of marijuana in the second degree, a violation of Penal Law § 221.25. He moved to suppress the marijuana, arguing that Trooper Shive did not have the proper level of suspicion to detain him to conduct the canine search of his car. After the court denied suppression, Mr. Blandford pleaded guilty to one count of attempted criminal possession of marijuana. He was sentenced to 1.5 years in prison, in a "shock incarceration" program, followed by two years of supervision.

Mr. Blandford appealed. The Appellate Division, with one Justice dissenting, affirmed, holding that "taken together, the trooper's observations of defendant . . . created a founded suspicion that criminal activity was afoot" and that Trooper Shive therefore "properly extended the stop beyond its initial justification" to "conduct[] the canine search" (*People v Blandford*, 190 AD3d 1033, 1037 [3d Dept 2021]).

## II.

When Trooper Shive was asked why he stopped Mr. Blandford, he answered under oath: "I'm conducting a pretext stop." Given his candor, I suspect Trooper Shive and Investigator Backer would not quarrel with the following summary of the record, which I

recite in the light most favorable to the prosecution. Without any real evidence, but just "general police knowledge," the officers believed Mr. Blandford was selling marijuana. So they watched him. They were almost able to stop him for a seatbelt violation, but Trooper Shive and his dog did not arrive in time. When following him after he left the store, it was their good fortune that one of his two license plate lights was not illuminated, giving Trooper Shive a basis to stop him. In a further bit of luck, Mr. Blandford consented to let them search part of his car. In a bit of bad luck, that produced no results. But they ended up getting what they had wanted: the ability to have a drug detection dog sniff the car, the result of which gave them a reason to arrest Mr. Blandford and seize the evidence against him.

Of course, Mr. Blandford's car was parked for a while, in plain view of Trooper Shive and Investigator Backer, outside the convenience store. The store was known as a trouble spot. A handshake or hug is sometimes used to convey drugs. Why couldn't Trooper Shive have just walked up with his dog and had the dog sniff the car? Well, the Fourth Amendment would prohibit that. How about the handshake and hugs, the passenger, Mr. Blandford exiting the store with no purchases – all that happened before Mr. Blandford left the parking lot – why not just take a stroll by and let Clark get a good whiff? Sorry, the Fourth Amendment still would have prohibited that. Once Mr. Blandford's car was moving again, the officers needed some basis to stop it. This time, one infers that Mr. Blandford was wearing his seatbelt, because the officers did not stop him on that basis and issued no citation for that infraction. Driving with one nonfunctioning license plate light bulb is a

traffic infraction, so Trooper Shive had a basis to stop the car to issue a citation. I think it fair to say, though, that Trooper Shive did not stop the car because he wanted Mr. Blandford to get a new lightbulb.

Mr. Blandford's case illustrates a troubling aspect of police behavior: law enforcement can pursue someone they suspect of criminal behavior without a founded suspicion of criminality, wait for the right moment to stop that person for a minor traffic infraction, and then serve up a stew of flavorless facts to transform a stop in which they have no intrinsic interest into the search they sought before they had any evidentiary basis to suspect wrongdoing. Although this case illustrates that problem, its resolution should be much simpler than resolution of the systemic problem: here, the officers did not possess information sufficient to justify the canine search.

A. <u>The traffic stop.</u>

The police may stop a vehicle 30 minutes or later after sunset if one of its license plate lights is not working. Although one might question the cost/benefit calculus of permitting police stops on that basis, that is a legislative choice. However, it is worth noting that a minor change in factual findings would have rendered the stop unlawful.

The first traffic infraction allegedly observed by law enforcement was Mr. Blandford driving without a seatbelt while Mr. Blandford was on his way to the convenience store. The Appellate Division upheld the denial of suppression in part because Trooper Shive "was entitled to rely upon [Investigator Backer's] previous observation that [Mr. Blandford] was driving without a seatbelt – a separate traffic violation that also

provided probable cause for [Trooper Shive's] stop" (*Blandford*, 190 AD3d at 1036 [internal citations omitted]). That analysis is incorrect. Although Trooper Shive could ordinarily rely on Investigator Backer's information about the alleged seatbelt violation to pull Mr. Blandford over (*People v Ramirez-Portoreal*, 88 NY2d 99, 113 [1996]; *People v Horowitz*, 21 NY2d 55, 60 [1967]), Mr. Blandford parked and exited his car before Trooper Shive arrived. Once Mr. Blandford exited his car, entered and exited the store, and began driving anew, the prior seatbelt infraction cannot be used to justify a later stop. The Appellate Division's rationale would allow officers to pull someone over hours or even days after they originally observed that person driving without a seatbelt or committing any other traffic infraction.

Trooper Shive may have understood what the Appellate Division did not – that he could not stop Mr. Blandford based on the prior seatbelt infraction. Accordingly, Trooper Shive followed Mr. Blandford in the hope of finding a new traffic infraction or some other basis to stop the car. New York's Vehicle and Traffic Law states that motor vehicles, excepting motorcycles, are required to have a white light illuminate their license plate for at least fifty feet from the rear of the car under certain conditions (VTL § 375 [2] [a] [4]). Those conditions include when the vehicle is driving on a public highway from one half-hour after sunset to one half-hour before sunrise, "or . . . at such other times as visibility for a distance of one thousand feet ahead of [the] motor vehicle is not clear" (*id.*).[1] On the

---

[1] The plainest reading of the 1000-foot visibility provision is that it is meant to apply to situations where weather conditions – such as rain, fog or wind – impair forward visibility,

evening that Trooper Shive pulled Mr. Blandford over for his allegedly unilluminated license plate, a half-hour had not yet passed since sunset (*Blandford*, 190 AD3d at 1035). Nevertheless, the Appellate Division credited Trooper Shive's testimony that "it was fully dark at the time of the stop," on which basis the Appellate Division found that it was "'objectively reasonable' for the trooper to conclude that the requisite visibility did not exist and that a traffic violation had been committed" (internal citations omitted) (*id.*).[2]

Thus, the legality of this stop cannot be justified by the prior seatbelt infraction or by more than 30 minutes passing from sunset; it turns not on Trooper Shive's testimony that forward visibility was less than 1000 feet, but on the Appellate Division's conclusion that it was reasonable to believe that, if it was "fully dark," visibility was less than 1000 feet.

I conclude from the above that the stop of Mr. Blandford was pretextual. But you needn't believe me—Trooper Shive swore it was. The officers guessed correctly that Mr. Blandford possessed drugs; whether a seatbelt infraction or license plate bulb failure or some other flaw existed was irrelevant to the officers, so long as it provided a basis to stop his car. Pretextual, however, does not mean unlawful.

B. The canine search.

---

not by darkness outside of the times prescribed in the statute. However, Mr. Blandford has not advanced that interpretation of the statute, so I do not address it further.

[2] For Elmira, NY, on November 17, 2017, total darkness began at 6:23 PM, or well over an hour from when Mr. Blandford was stopped (*see* http://suncalc.net/#/42.1055,-76.8041,6/2017.11.17/08:09).

Though the stop was lawful, the canine search for which Trooper Shive prolonged the stop violated Mr. Blandford's constitutional rights under the New York and federal constitutions.

Under the New York Constitution, the level of suspicion required before law enforcement can conduct a canine search of the exterior of a lawfully stopped vehicle is a "founded suspicion that criminal activity is afoot" (*People v Devone*, 15 NY3d 106 [2010]). That level of suspicion is "level two" in a four-level framework this Court explicated for various police-civilian encounters (*People v DeBour*, 40 NY2d 210, 223 [1976]). The Appellate Division held that "taken together, the trooper's observations of defendant engaging in behaviors commonly seen in outdoor drug transactions at a location known for such activity, his 'slow roll response' and furtive movements after the trooper initiated the stop and his evasive, inconsistent answers to the trooper's questions created a founded suspicion that criminal activity was afoot" (*Blandford*, 190 AD at 1036). For the Appellate Division, Trooper Shive therefore properly extended the stop beyond its initial justification to conduct the canine search (*id.*). Because determinations regarding the existence of a founded suspicion of criminality involve mixed questions of law and fact (*see People v Mercado*, 25 NY3d 936, 937 [2015]), our standard of review is "whether there is evidence in the record supporting the lower courts' determinations" (*People v McIntosh*, 96 NY2d 521, 524 [2001]). In affirming the Appellate Division, the majority holds that "[t]here is record support for the determination that a founded suspicion of criminal activity was afoot" justifying Trooper Shive's canine search. I disagree. The facts relied upon by the

lower courts do not support a founded suspicion that Mr. Blandford was engaged in criminal activity.

First, Mr. Blandford's handshake or hug to at least one person outside the convenience store does not support any suspicion of criminality. Notably, neither officer observed Mr. Blandford deliver or receive any contraband when they saw him greet at least one person outside the store; instead, each acknowledged that his conduct could have been completely innocent. Unless we are prepared to say that the police may detain anyone who hugs or shakes hands outside of a store known to the police to have been the site of drug transactions, those facts cannot be a basis for stopping Mr. Blandford. We should also keep in mind that such a rule would fall more harshly on communities of color and low-income communities: shaking hands as you enter Saks will likely not result in your detention. Because neither Trooper Shive nor Investigator Backer observed any exchange of contraband, it was improper for County Court to consider Mr. Blandford's handshake or hug as a factor supporting its finding that there was a founded suspicion of criminality afoot justifying Trooper Shive's canine sniff.

Second, contrary to the holding of the majority and the Appellate Division, the record does not support a finding that Mr. Blandford gave "inconsistent answers to the trooper's questions" (*Blandford*, 190 AD3d at 1036). According to Trooper Shive, Mr. Blandford told him that he was giving Mr. Gerdeep Singh, his fellow passenger, a ride home and that Mr. Singh's family owned the store. Nothing in the record suggests those statements were untrue. Mr. Blandford talked about his wallet and money, and he indicated

that he was in the store to buy items. The trooper observed his wallet in the car, which matches Mr. Blandford's statement that his wallet was in the back of the car. Because Trooper Shive "didn't observe anything that [Mr. Blandford] bought," he claimed that he and Mr. Blandford "just kind of talked in a circle." Again, nothing is inconsistent or suspicious about entering a store and leaving emptyhanded. Perhaps the store did not have what Mr. Blandford wanted; perhaps it cost too much; perhaps he got diverted by giving Mr. Singh a ride home. Indeed, the statements made by Mr. Blandford are very different from the statements in *Devone*, where inconsistency contributed to a finding that a founded suspicion existed (15 NY3d at 113 [a driver told officers that his cousin owned the vehicle but did not know his cousin's name; then said that male passenger was his cousin though the vehicle was registered to a female]). Even if Mr. Blandford's statements had been inconsistent, which they were not, discrepancies are not enough to give rise to a founded suspicion of criminality afoot (*see People v Milaski*, 62 NY2d 147, 156 [1984] [Defendant's reasons for his presence in a parking area, along with his "nervousness and other inconsistencies in his statements, provided no indication of criminality"]; *People v Dealmeida*, 124 AD3d 1405, 1407 [4th Dept 2015] [Nervousness and "discrepancies in describing where (someone) was coming from and going are not enough" to meet the second level in the *DeBour* framework]). Mr. Blandford's statements were not inconsistent, and the Appellate Division erred in factoring his statements into its ultimate finding that a founded suspicion of criminality afoot existed for Trooper Shive to conduct the canine search.

What remains is Mr. Blandford's "slow roll" while making "furtive movements." Perhaps those observations would justify stopping Mr. Blandford, but that is not at issue here: he was stopped for a nonfunctioning license plate lightbulb. Trooper Shive concluded that the slow roll and furtive movements around the floorboards and back seat made him suspicious that criminal activity was afoot.[3] The issue here is whether, at the time Trooper Shive determined to continue the stop and fetch his drug-sniffing dog, he had a reasonable suspicion that criminality was afoot. At that point, Mr. Blandford had consented to a search of the passenger section of his car. Trooper Shive found no contraband. He found Mr. Blandford's wallet in the rear, which would explain the "furtive movements" and slow roll. He learned that Mr. Blandford was driving home someone related to the owner of the On the Way store. Those facts must also be taken into account in determining whether, at the time the trooper decided to prolong the stop and conduct a canine sniff, he had a founded suspicion that criminality was afoot. Whatever suspicions he might have had from the slow roll and furtive movements had proved unfounded. The officers can point to no fact whatsoever suggesting that drugs might have been squirreled away in an inaccessible part

_____

[3] According to Trooper Shive, Mr. Blandford was "ducking down in his seat, moving about within his seat, and at a point reaching over the passenger's seat, doing something, appearing to be down in the floorboard area and/or the backseat." The trooper could not "see physically where [Mr. Blandford's] final reach [was]." When searching the car on consent, the trooper saw Mr. Blandford's wallet in rear. The slow roll and furtive movements could easily have been Mr. Blandford's attempt to retrieve his license before he came to a stop. Additionally, the "slow roll stop" by Mr. Blandford is not of the sort that suggests criminality. The Appellate Division relied on *People v Sanders* (185 AD3d 1280 [3d Dept 2020]), which involved a slow roll stop by a motorist stopped by Trooper Shive after the defendant "rapidly accelerated," "squared the block" and cut through one-way markers in a parking lot before he "slow roll[ed]" for an entire city block before stopping (*id.* at 354). No such evidence appears in the record here.

of the passenger compartment or in the trunk. Instead, the facts as known to Trooper Shive after he conducted the search and spoke with Mr. Blandford unequivocally suggested that no criminal activity was afoot.

III.

Mr. Blandford also raises two arguments under the U.S. Constitution. First, he argues that Trooper Shive was not permitted to conduct the canine search under the federal constitutional standard, which Mr. Blandford argues requires reasonable suspicion, a higher threshold than "a founded suspicion of criminal activity afoot." Second, Mr. Blandford argues that this Court's application of the *DeBour* level two standard of suspicion to canine searches during traffic stops through *Devone* is therefore unconstitutional.

The majority concludes that Mr. Blandford failed to preserve those arguments. I disagree. In the suppression court, Mr. Blandford's attorney argued that the canine search was improper under *Rodriguez v United States* (575 US 348 [2015]), which concerns the U.S. Constitution's protections during traffic stops. Mr. Blandford again cited *Rodriguez* in his brief to the Appellate Division as presenting "another legal issue" raised by his case, arguing that "there is no authority" for police to conduct a canine sniff under the facts and proposition of the case (Brief of Appellant to the Appellate Division at 20). Thus, Mr. Blandford sufficiently argued below that the canine search was improper under the constitutional standard articulated in *Rodriguez*. In the suppression court, Mr. Blandford does not appear to have argued explicitly that the *DeBour* and *Devone* standards are

unconstitutional. Nevertheless, the argument is necessarily raised by what he did say in the suppression court. By arguing that the canine search violated both New York and federal constitutional standards, which are higher, Mr. Blandford necessarily raised the question whether our state standard is preempted by the federal constitution and therefore unconstitutional. Although our state constitution can provide greater protections than the U.S. Constitution (*People v Weaver*, 12 NY3d 433, 445 [2009]; *People v Scott*, 79 NY2d 474, 502-06 [1992]; *People v Torres*, 74 NY2d 244, 228 [1989]), it cannot provide less. Thus, Mr. Blandford's argument that a judicial interpretation of our state constitution – here, *Devone's* holding that canine searches should be analyzed under level 2 of *DeBour* – that permits canine searches where the U.S. Constitution would deem them unlawful, unmistakably means that he is challenging the constitutionality of *Devone*. In any event, the second issue is only semantically different from the first: if Mr. Blandford is correct that the canine search violates the U.S. Constitution, New York constitutional law cannot save the sniff.

In *Rodriguez*, the U.S. Supreme Court held that "a police stop exceeding the time needed to handle the matter for which the stop was made violates the [U.S.] Constitution's shield against unreasonable seizures" (575 US at 350). The Court specifically held that a canine sniff conducted by an officer after a traffic stop was completed, without the owner's permission, was improper (*id.* at 352). The Court noted that "[a]n officer may conduct certain unrelated checks during an otherwise lawful traffic stop" but "may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify

detaining an individual" (*id.* at 355). A canine search for drugs is not among the "ordinary inquiries incident to [the traffic] stop" (*id.*, quoting *Illinois v Caballes*, 543 US 405, 408 [2005]). Thus, "[t]he critical question . . . is not whether the dog sniff occurs before or after the officer issues a ticket . . . but whether conducting the sniff 'prolongs' – *i.e.*, adds time to – 'the stop'" (*id.* at 357 [internal citations omitted]). Because the officer in *Rodriguez* prolonged the traffic stop to conduct the canine sniff, the Court held that there needed to be a "reasonable suspicion of criminal activity" to "justif[y] detaining Rodriguez beyond completion of the traffic infraction investigation" (*id.* at 358). *Rodriguez* thus stands for the proposition that, under the federal constitution, an officer must have "reasonable suspicion of criminal activity" to justify prolonging a traffic stop to conduct a canine search of an automobile.

Determining whether Trooper Shive's canine search passes muster under *Rodriguez* involves two central questions: first, whether Trooper Shive prolonged the traffic stop to effectuate the canine search and second, if he did, whether he had a reasonable suspicion of criminal activity to justify it. There is no question that Trooper Shive prolonged the stop to conduct the canine search—he had to return to his vehicle to get the canine, with Mr. Blandford not free to leave in the interim. Indeed, the Appellate Division made a factual finding that the trooper "extended" the traffic stop "beyond its initial justification" to conduct the canine search (*Blandford*, 190 AD3d at 1036).

Thus, the issue devolves to the second question: did the trooper have a reasonable suspicion to warrant a canine search? The "reasonable suspicion" standard is higher than

the "founded suspicion" standard under the New York Constitution (*see DeBour*, 40 NY2d at 223 [describing a four-tiered framework for levels of suspicion, with the second level of suspicion (required for police officers to make inquiries) as "a founded suspicion that criminal activity is afoot" and a third, higher level of suspicion (required for police officers to complete a forcible stop and detention) as a "reasonable suspicion that a particular person has committed or is about to commit a felony or misdemeanor"]; *Devone*, 15 NY3d at 110 [holding that the second *DeBour* level of suspicion applies to canine sniffs of cars during lawful traffic stops]). As discussed earlier, the record does not support a finding that there was a founded suspicion, and therefore it also cannot support a finding that there was a reasonable suspicion, which is a higher standard.

Because the federal standard in *Rodriguez* requires a higher level of suspicion than does level 2 of *DeBour*, *Devone*, which was decided 5 years before *Rodriguez*, can no longer be good law. Whether articulated in that way or, instead, by saying that the canine search here was unlawful under the federal standard but not the New York standard does not have any practical importance. Regrettably, the majority concludes that neither way of phrasing the issue was properly preserved, which means that officers and civilians alike must live with uncertainty about the proper test to be applied to canine searches. I would point those in doubt to the Supremacy Clause and the incorporation of the Fourth Amendment through the Fourteenth.

IV.

Mr. Blandford's letter brief raises several policy considerations about police practices in communities of color, arguing that "[t]his case is about . . . how we as a society want to treat persons of color in their neighborhoods and when they step into cars." He contends that existing laws, and their judicial interpretations, have led law enforcement officers to "stitch together disparate innocuous facts" to satisfy the founded suspicion standard they need to meet for certain intrusions. An objective reader of the facts would have to conclude that the officers here were not concerned that Mr. Blandford would be injured because he was not wearing a seatbelt, or that his license plate could not be read with only one working lightbulb. Rather, they suspected—for reasons we don't know— that he was dealing drugs. It is not reasonable to believe their suspicion was based on his hugs, his fruitless shopping at a convenience store or his giving a friend a ride. After searching his car and speaking with him, it could not have been based on a slow roll or furtive movements. It must have been based on something else—something they suspected well before that November afternoon. Because that "something else" is not in the record, we are left to wonder how benign or pernicious that suspicion may have been.

On review of submissions pursuant to section 500.11 of the Rules, order affirmed, in a memorandum. Chief Judge DiFiore and Judges Garcia, Singas and Cannataro concur. Judge Wilson dissents in an opinion, in which Judges Rivera and Fahey concur.

Decided October 14, 2021