People v Desronvil (2025 NY Slip Op 51866(U))

[*1]

People v Desronvil

2025 NY Slip Op 51866(U)

Decided on November 24, 2025

County Court, Columbia County

Howard, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on November 24, 2025
County Court, Columbia County

The People of the State of New York,

against
Stepha Desronvil, Defendant.

IND-70352-24/001

CHRISTOPHER LIBERATI-CONANT
COLUMBIA COUNTY DISTRICT ATTORNEY
By: Nicholas Rohlfing, Esq.
Assistant District Attorney
325 Columbia Street
Hudson, New York, 12534
SHANE ZONI, ESQ.
COLUMBIA COUNTY PUBLIC DEFENDER
By: Bryan Bergeron, Esq.
Assistant Public Defender
610 State Street
Hudson, New York 12534

Michael C. Howard, J.

This Court granted a motion for a suppression hearing in a decision and order dated June 9, 2025. The matter came on for a hearing on August 25, 2025, at which testimony was taken from Troopers Edward Reiser and Patrick Porteus. Still images were admitted into evidence as People's 1, 2 and 3. Body camera recordings were admitted into evidence as People's Exhibits 4 and 5. The New York State Police Investigative Report was admitted as Defendant's Exhibit A.
After the hearing defense counsel submitted proposed findings of fact and conclusions of law which were filed with the Court October 14, 2025. Thereafter, the People submitted their papers in a filing received by the Court October 27, 2025, and by chambers on October 29, 2025. Defense counsel then submitted papers in opposition to the People's filing stamped October 29, 2025. The People objected to defense's reply in an email dated October 28, 2025. The Court considers the matter fully submitted and briefed, and thanks counsel for their diligent efforts.
Both Trooper Reiser and Trooper Porteus are K9 officers for the New York State Police. Trooper Reiser was controlling K9 Dunn at the time of the incident, a dog who has since retired. 
On June 12, 2024, Trooper Reiser, and Trooper Porteus were both parked in their NYSP [*2]vehicles in a U-Turn pull off on I-90 near the Massachusetts border.
Trooper Porteus and his partner, Investigator Moore, stopped a Dodge Durango with New Jersey plates and tinted windows allegedly in violation of VTL § 375(12-a)(b), i.e. not allowing at least 30% of visible light to transmit through the windows. The sole reason for the stop was window tint, although after the arrest a seatbelt ticket was also issued. Pictures of the tint and body camera recordings introduced at the hearing show that the interior of the vehicle was visible through the windows that the Troopers allege were illegally tinted. 
No tint meter evidence was introduced at the hearing. Both Reiser and Porteus described seemingly rudimentary training, undergone 13 years and 8 years ago, respectively, in identifying excessive tint in their New York State Police training. Both Troopers stated that they were shown a police vehicle with no tint, and a tint meter was used to show that the NYSP vehicle's windows allowed slightly over 70% of visible light to transmit through the glass, which is the minimum light transparency permitted under the VTL. The Troopers both testified, in sum and substance that NYSP training concluded that any aftermarket tint applied to the front side windows in a vehicle would bring light transmissibility to below 70%, and thus be in violation of the New York State Vehicle and Traffic Law.
Approximately three minutes after Trooper Porteus stopped the vehicle, Trooper Reiser responded to assist. Trooper Reiser explained that "if Trooper Porteus and Investigator Moore requested a presence of the other unit that they had either, one, had an officer safety concern, or were requesting our presence to assist in the further investigation outside of the traffic infraction."
Immediately after the stop, at approximately 5:18PM, Trooper Porteus had Mr. Desronvil get out of the car because of the smell of burnt cannabis, and also "to further investigate." Trooper Porteus testified that during his investigation, at no point was Mr. Desronvil free to leave.
Trooper Porteus testified that Mr. Desronvil did not seem impaired. Mr. Desronvil showed Porteus unburnt marijuana from his pants pocket, protesting that cannabis was legal. Trooper Proteus did not administer any field sobriety tests. Trooper Porteus testified variously that he determined that Mr. Desronvil was not impaired after a 2 to 5 minute conversation, or 3 to 10 minutes. Neither Porteus' suspicion of DWAI drugs, nor the smell of burnt cannabis was noted in the New York State Police Incident Report. Trooper Porteus did not mention his investigation of suspected impaired driving during his preliminary hearing testimony. This causes the court concerns about the veracity of this witness.
Trooper Porteus questioned Mr. Desronvil where he was going and where he came from. Mr. Desronvil told him he was from Union, New Jersey, and he was coming from "MSG Casino," which Porteus took to mean MGM Casino in Springfield, Massachusetts. Mr. Desronvil also said he was visiting friends. Trooper Porteus concluded that defendant's trip from New Jersey to a casino in Massachusetts and then to visit friends was "somewhat suspicious."
Trooper Porteus testified that he looked at License Plate Reader information to ascertain Mr. Desronvil's vehicle's route. He testified that he determined that the vehicle had entered the Thruway system on I-287 southbound in Westchester County coming from Rockland County, and there was another hit prior to the traffic stop in Manchester, Connecticut. Trooper Porteus testified that he determined that the casino was 2 ½ hours away from the location the vehicle entered I-287. Trooper Porteus testified the itinerary did not make sense to him. 
Rachel Dittmer was removed from the vehicle at 5:27PM, and questioned by Trooper [*3]Reiser. The body camera footage is muted for the roadside conversation between Reiser and Dittmer. The reason for muting the body camera footage is unknown to this Court. Trooper Reiser observed that she had bloodshot watery eyes and her speech was delayed. He testified that he smelled burnt marijuana, but he did not put that observation into the incident report.
Reiser questioned Rachel Dittmer about her itinerary. Trooper Reiser testified that during his questioning, Dittmer did not mention any stops along the way "of note." He testified that she said "something in regards to Massachusetts," but he did not remember exactly what Ms. Dittmer said. The New York State Police Incident Report reveals that Dittmer told Reiser that she was coming from Middlesex, New Jersey to Massachusetts to look at her aunt's property. At the hearing, Trooper Reiser testified that he told Ms. Dittmer that "her account of travel did not make sense and she could not provide a plausible explanation to describe their travel." Trooper Reiser explained to the Court that the most direct route from Middlesex, New Jersey to New York State would not involve traveling on I-90 on the Berkshire Spur, but straight up the Thruway or the Taconic State Parkway. 
Based on this conversation, Trooper Reiser claimed that he felt he had reached a founded suspicion of criminal activity. He testified he based this founded suspicion on Ms. Dittmer's demeanor, i.e. disheveled, translucent skin tone, bloodshot watery eyes, delayed lethargic speech, her inability to account for her travel, and her inability to describe her relationship with Mr. Desronvil. At the suppression hearing, Trooper Reiser claimed he had a founded suspicion of human trafficking or prostitution. However, he did not include that suspicion in his incident report, despite his assertion that it was a concern, nor did he testify about the possibility of human trafficking at the preliminary hearing on June 18, 2024.
Trooper Reiser told Porteus that he believed Ms. Dittmer was a narcotics user. Trooper Porteus testified that he thought he had founded suspicion to request to search the car based upon what he called a "confliction" in Mr. Desronvil's and Ms. Dittmer's itinerary. Trooper Porteus testified that he learned from Trooper Reiser that Trooper Reiser believed Ms. Dittmer was a possible victim of human trafficking. However, Trooper Porteus stated that he did not include any mention of the suspicion of human trafficking in the incident report that he generated for this case. 
At 5:27PM, Trooper Porteus asked Mr. Desronvil for his consent to search the car. Mr. Desronvil questioned the need to search the car, and told Trooper Porteus that he did not consent. Trooper Porteus testified that he told Mr. Desronvil that upon his refusal to consent, he would be subjected to a dog sniff of the vehicle he was operating. Mr. Desronvil objected, stating that the dog would react to the smell of cannabis. Trooper Porteus testified that the dog was not trained on cannabis. 
At around 5:30PM, Trooper Reiser had his dog smell the exterior of the vehicle. The subject vehicle was parked just to the right of the fog line. The body camera footage shows Trooper Reiser walking K9 Dunn briskly alongside the driver's side of the vehicle in the lane of traffic, coming around the front of the vehicle, and pausing at the passenger side of the vehicle. In the body camera footage, while Trooper Reiser stood next to the passenger's side of the vehicle, K9 Dunn can be observed wagging his tail, cocking his head near the front passenger door, and ultimately scratching at the rear passenger side door of the vehicle. A crack pipe was located in a box in the front passenger door pocket and approximately ten thousand dollars in cash was found bundled in various denominations on the rear seat on the driver's side of the vehicle in a backpack.
At 5:37PM, Trooper Reiser's body camera picked up a conversation during the car search in which Ms. Dittmer is initially described as a "prostitute," and then a "crackhead prostitute" by the Troopers. It is unclear which Trooper is making the statement, but it appears that the two officers are in agreement. At 5:41PM, the Troopers can be heard discussing the possibility that Ms. Dittmer is a prostitute probably travelling between casinos, in this case between MGM and River's Casino (in Schenectady). Trooper Porteus and Trooper Reiser can be heard discussing Mr. Desronvil and Ms. Dittmer while looking through Ms. Dittmer's travel bags at around 5:42PM, when one of them states "I think this is human trafficking." Trooper Reiser testified that he did not participate in the probable cause search of the car, despite his appearing on body camera footage going through travel bags in the back of the car.It is unknown if this misstatement is intentional or accidental.
At 5:44PM, Trooper Porteus told Rachel Dittmer that she will be arrested and certainly strip searched at the police station, apparently based upon the crack pipe in the box in the front passenger door pocket. Porteus told her that if she had anything on her when they got to the police station, that she would "not be going home tonight." At 5:45PM, Rachel Dittmer told Porteus she had two big bags concealed on her; he unhandcuffed her; she took out the bags and placed them on the hood of the Dodge Durango; he rehandcuffed her and gave her a cigarette to smoke.
During the suppression hearing, Trooper Reiser testified that he did not specifically recall calling Ms. Dittmer a whore. Trooper Porteus testified that he did not recall overhearing Trooper Reiser call Mr. Desronvil a "pimp" and Ms. Dittmer a "whore," nor answering "Nailed it!" in response. At the hearing, the relevant body camera footage was played for both Troopers. On Trooper Reiser's body camera, 5:48PM, Troopers Reiser can be heard saying "She's his whore, he's the pimp and that's the party." Trooper Porteus can be heard saying "Nailed it!" 
Trooper Porteus issued a ticket for the tint and also for a seatbelt violation, which he testified that he observed when the vehicle was stopped. It is unclear when the tickets were actually written, as Trooper Porteus did not answer the question at the hearing, despite having been asked. Upon a review of the traffic tickets issued to Mr. Desronvil, they are returnable in Canaan Town Court the same day they were written, at 11:00PM in the night. This strikes the Court peculiar, as court staff would not typically be present at that hour, unless the Troopers planned to bring Mr. Desronvil in for an arraignment following the traffic stop.
The credibility of the police witnesses matters, as it is their testimony upon which the People must make their burden of proof. "[T]hough a defendant who challenges the legality of a search and seizure has the burden of proving illegality, the People are nevertheless put to the burden of going forward to show the legality of the police conduct in the first instance." People v. Berrios, 28 NY2d 361, 367 (1971). "Implicit in this concept is that the testimony offered by the People in first presenting their case must be credible." People v. Quinones, 61 AD2d 765, 765 (1st Dep't 1978).
A traffic stop must be based upon probable cause to believe a traffic infraction has been committed. People v. Hinshaw, 35 NY3d 427, 430 (2020). In the instant case, the reason given by law enforcement for the traffic stop was excessive window tint, in violation of VTL § 375(12-a)(b). "Window tints are not categorically impermissible under New York State law; they are only prohibited for specified windows to the extent that they allow less than 70% light transmittance." People v. Nektalov, 42 NY3d 363, 367 (2024). 
The body camera footage showed that the side windows were transparent, and that one [*4]could, and the Court did, see through the windows into the vehicle. Assuming for the purposes of argument that the Trooper's experience and training did in fact give them probable cause for the stop of Mr. Desronvil's vehicle, the Court will examine the subsequent police encounter.
Under New York State law, police are permitted to ask people out of the vehicle at a traffic stop for equipment violation tickets. People v. Ambrosio, 235 AD3d 1181, 1185-86 (3d Dep't 2025). An informational inquiry, "basic, nonthreatening questions regarding, for instance, identity, address or destination" for the purposes of issuing a ticket, is also proper. People v. Hollman, 79 NY2d 181, 185 (1992). "Once the officer asks more pointed questions that would lead the person approached reasonably to believe that he or she is suspected of some wrongdoing and is the focus of the officer's investigation, the officer is no longer merely seeking information. This has become a common-law inquiry that must be supported by a founded suspicion that criminality is afoot." People v. Hollman, 79 NY2d 181, 185 (1992).
Here, the Troopers got both Mr. Desronvil and Ms. Dittmer out of the vehicle, conducted separate and separated informational inquiries of both driver and passenger, and compared their description to license plate reader information. Contrary to the Trooper's assertions, the Court does not find the route of travel described by Ms. Dittmer and Mr. Desronvil to be necessarily suspicious or confusing. Interstate 287 crosses from Rockland County southeast to Westchester County. Driving north through Connecticut, as people taking the interstate highways to travel from New Jersey to Massachusetts may do, will put a traveler in the proximity of Manchester, Connecticut. Nothing about the route described by Mr. Desronvil or Ms. Dittmer struck the Court as creating a founded suspicion that criminality was afoot. 
Ms. Dittmer's so called "disheveled" appearance, and "translucent" skin were not apparent to the Court on the body camera recording, nor was her slowness of speech. Trooper Reiser's testimony that she was a narcotics user and a suspected victim of human trafficking notwithstanding, she was charged along with Ms. Dittmer with possession of a controlled substance with the intent to sell it. The New York State Police press release concerning the arrest simply stated that two "drug dealers" were intercepted on the Berkshire Spur. To the best of the Court's knowledge, no investigation into the suspected human trafficking was concluded, aside from mean spirited comments using vulgar language to characterize Ms. Dittmer and Mr. Desronvil's alleged relationship.
Trooper Porteus' investigation as to whether Mr. Desronvil was driving under the influence of drugs was cursory at best. Despite Porteus' detection of the odor of burnt cannabis, no burnt cannabis was located. No field sobriety tests were administered, and Porteus determined that Mr. Desronvil was not impaired in short order, in as little as two minutes according to his own testimony. 
Mr. Desronvil's conversation with Trooper Porteus at the roadside was strained and awkward, more an interrogation than an informational inquiry. Yet, this common law inquiry, unsupported by a founded suspicion was reverse engineered by the Troopers to support a founded suspicion of criminality.
The Court finds the Troopers' testimony incredible as to their suspicion of human trafficking. The fact that the Troopers denied or denied remembering using the word "whore" in reference to Ms. Dittmer, and the word "pimp" in reference to Mr. Desronvil calls into question the credibility of the alleged human trafficking investigation. This so-called suspicion began and ended at disparaging and offensive language. The Troopers' suspicion was predicated on Ms. Dittmer's demeanor and appearance, but was apparently not significant enough to follow up [*5]on, as it quickly became irrelevant after felony weight contraband was secured.
It is apparent that the separate interviews of Mr. Desronvil and Ms. Dittmer were initiated with the goal to find conflicting statements, in order to manufacture the "founded suspicion" the Troopers testified they believed was necessary to request to search the vehicle. The Court here finds that the separate interviews unreasonably prolonged the traffic stop.
The People argue here that the level of suspicion required for a dog sniff of the exterior of a lawfully stopped vehicle is a founded suspicion. Caselaw supports the proposition that a request for consent to search a vehicle or a dog sniff of a vehicle is justified by a founded suspicion that criminality is afoot. See People v. Almenteros, 214 AD3d 1027, 1028 (3d Dep't 2023); People v. Medina, 40 NY3d 1022, 1023 (2023); People v. Blandford, 190 AD3d 1033, 1035 (3d Dep't 2021), affirmed 37 NY3d 1062 (2021).
However, the Court of Appeals, citing Supreme Court precedent, has recently held that "[t]he proper standard for detaining an individual beyond the time reasonably required to complete a traffic stop is reasonable suspicion." People v. Thomas, 42 NY3d 236, 240 (2024), quoting Rodriguez v. U.S., 575 U.S. 348, 350-51 (2015) (Internal quotation marks omitted). 
The United States Constitution provides a floor for the minimum level of protection of individual's civil rights, below which the New York State constitutional protections cannot fall.[FN1]
"The provision against unlawful searches and seizures contained in NY Constitution, article I, § 12 conforms with that found in the 4th Amendment, and that this identity of language supports a policy of uniformity between State and Federal courts" People v. P.J. Video, Inc., 68 NY2d 296, 304 (1986). 
The Fourth Amendment to the United States Constitution states "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." The New York State Constitution Article I, Section 12 also indicates "The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."
There was no search warrant applied for in this case, written, nor oral, so the People must "carry the burden of overcoming the presumptive unreasonableness of the warrantless vehicle search." People v. Messano, 41 NY3d 228, 236 (2024).
In examining a dog sniff of a vehicle stopped for a traffic infraction, the United States Supreme Court found that the "critical question, then, is not whether the dog sniff occurs before or after the officer issues a ticket . . . but whether conducting the sniff prolongs — i.e., adds time to — the stop." Rodriguez, 575 U.S. at 357. The justification for a seizure ends when the routine tasks of issuing a traffic ticket are completed. "An officer . . . may conduct certain unrelated checks during an otherwise lawful traffic stop. But . . . he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." [*6]Rodriguez, 575 U.S. at 355.
It is apparent that the reason that Trooper Porteus called Trooper Reiser to the scene was for the purpose of manufacturing a founded suspicion so that a dog sniff could be conducted.
In this case, the traffic stop was prolonged to question Mr. Desronvil and Ms. Dittmer separately regarding their origin and destination and then check their stories against license plate reader information. The stop was further prolonged to conduct the dog sniff of the exterior of the car. "A canine search for drugs is not among the ordinary inquiries incident to the traffic stop. . . . There is no question that Trooper [Reiser] prolonged the stop to conduct the canine search — he had to return to his vehicle to get the canine." Blandford, 37 NY2d at 1074, Wilson in dissent, internal quotation marks omitted. When the car search following the dog sniff turned up a small quantity of contraband, further interrogation of Ms. Dittmer led to the discovery of felony weight contraband.
The Court is left with questions regarding the actual reasons for the Troopers' desire to conduct a dog sniff of the car. The Marihuana Regulation and Taxation Act, specifically Penal Law § 222.05(3), provides that the odor of cannabis, burnt or unburnt, can no longer be the basis of a police search. People v. Pastrana, 41 NY3d 23, 28 (2023). The itinerary described in testimony by the Troopers was as susceptible of an innocent explanation as a suspicious one. The purported fears of human trafficking can be completely discounted. The Court cannot countenance a search based on a whim, or a hunch, especially where the reasons for such a whim are not in the record. The right of individuals to be free from unreasonable searches and seizures is part of the bedrock of our jurisprudence.
The prosecution here urges the Court to consider the consequences of suppression in this case, and to determine the evidence in that light. "There are those who say, as did Justice (then Judge) Cardozo, that under our constitutional exclusionary doctrine '(t)he criminal is to go free because the constable has blundered.' In some cases this will undoubtedly be the result. But . . . 'there is another consideration—the imperative of judicial integrity.' The criminal goes free, if he must, but it is the law that sets him free. Nothing can destroy a government more quickly than its failure to observe its own laws, or worse, its disregard of the charter of its own existence. As Mr. Justice Brandeis, dissenting, said in Olmstead v. United States, 'Our government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example. If the government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy.'" Mapp v. Ohio, 367 U.S. 643, 659 (1961), citing People v. Defore, 242 NY 13 (1926); Elkins v. U.S., 364 U.S. 206 (1960); Olmstead v. U.S., 277 U.S. 438 (1928). 
In the absence of reasonable cause to prolong the traffic stop for the purpose of a car search, the evidence obtained as a result of the stop and search of the vehicle on June 12, 2024, is therefore suppressed from use at trial.
This is the Decision and Order of the Court.
Dated: November 24, 2025
Hudson, New York
ENTER
MICHAEL C. HOWARD, J.C.C.

Footnotes

Footnote 1:"[T]his Court has not hesitated to expand the rights of New York citizens beyond those required by the Federal Constitution when a longstanding New York interest was involved." People v. Robinson, 97 NY2d 341, 350 (2001)